610 So.2d 226 (1992)
Daniel S. MISTRIC, et ux., Plaintiffs-Appellees,
v.
Edna KURTZ, et al., Defendants-Appellants.
No. 91-1235.
Court of Appeal of Louisiana, Third Circuit.
December 9, 1992.
Writ Denied February 11, 1993.
*227 Jacque B. Pucheu, Jr., Eunice, for plaintiffs-appellees.
James P. Doherty, Jr., Opelousas, for defendants-appellants.
Before GUIDRY, DOUCET and WOODARD, JJ.
GUIDRY, Judge.
This is a boundary action involving adjoining properties located in downtown Opelousas, Louisiana. Plaintiffs, Daniel S. Mistric and Margie P. Mistric, filed this suit in 1989 to establish the boundary between their property and property of defendants, Edna Riseman Kurtz, Mildred Riseman, Katherine Riseman, Margaret Riseman and Elaine Riseman (the Risemans). The properties are located between Bayou Tesson on the west and Market Street on the east and front Landry Street on the south. The Riseman property lies immediately west of the Mistric property.
The parties trace their respective titles to a common author, Bernard Bennett and Albert Pickett. The defendants' title is the more ancient, having resulted from an October 30, 1905 sale to their father, Ben Riseman, from Bennett and Pickett. In the sale, Ben Riseman acquired a lot of ground measuring 104 feet, six inches east of Bayou Tesson fronting on Landry Street commencing from a fence post located to the east of Bayou Tesson. Bennett and Pickett did not transfer a small strip of land, of unstated width, running north-south which lay between the edge of Bayou Tesson and the fence post.
Plaintiffs trace their title to a sale from Bennett and Pickett to Harriet Siegel and Bertha Bohren executed on November 23, 1905. The Mistric tract measures 94 feet on its south boundary fronting on Landry Street by a depth of 66 feet. In the original conveyance, it is described as being bounded on the west by property of Ben Riseman. After several intervening conveyances, the Mistrics purchased the property from Dr. Edward G. Burleigh, Jr. and Melissa Burleigh on May 11, 1988.
Beginning sometime during the early 1940s, the Risemans commenced leasing their property. The first lessee, John Wilbert, constructed a Dairy Queen ice cream shop with a parking lot adjoining on the east. During the 1950s, Wilbert built a sandwich shop, the "Little Chef", on the northern edge of the parking lot. Thereafter, Wilbert erected a canvas canopy along the eastern edge of the parking lot from *228 the "Little Chef" southward toward Landry Street. The canopy is parallel to and located approximately 50 feet to the east of the Dairy Queen building.
On March 21, 1959, the Risemans leased their property to Queen's Concessions, Inc. which operated both the Dairy Queen and the Little Chef. On June 30, 1961, the Risemans leased the same property to Charles Going, Clifford Ryder, and H.J. Daniel, who then subleased the property to Alex Guidry, who also operated both businesses. Guidry died approximately two months later and, thereafter, the two businesses were owned and operated by his widow, Margaret Guidry, until sometime in 1970. During this period, Mrs. Guidry replaced the canvas parking canopy with a metal canopy which extended approximately two feet east of the paved parking lot. In 1970, Margaret Guidry sold the Dairy Queen and Little Chef to Joe Riley, who has since owned and operated both businesses.
Beginning in 1955, the Risemans' lessees began paying an annual fee to the Mistrics' ancestors-in-title, the Burleighs, for what was regularly noted in the Burleigh financial records as "lot rent", "parking lot rent", "rent of parking lot", "parking space lot rent" and "annual rent for parking space". The rent began at $50 per year in 1955 and increased to $75 per year in 1965. These payments continued until the Burleighs sold their property to the Mistrics in 1988. The record reflects that the Risemans were not aware that their tenants were paying this fee to the Burleighs, owners of the adjoining tract.
The dispute over the boundary began when, upon purchasing the Burleigh tract, Mistric informed Riley that his property extended westward into the Dairy Queen/Little Chef parking lot to include the area under the parking canopy and beyond. Mistric demanded $200 per month in rental payments for Riley's use of this parking area. Riley paid this rent for three months until he was informed by the Risemans that, as far as they were concerned, the entire area upon which the parking lot was located belonged to them. With this information, Riley then stopped paying rent to the Mistrics. The Mistrics then instituted this suit to fix the boundary.
Prior to trial, the Mistrics hired Morgan Goudeau and Associates to survey their tract. According to the results of the survey, the Mistric tract extends westward 32 feet into the Dairy Queen/Little Chef parking lot. Accordingly, Goudeau's survey fixes the western boundary of the Mistric tract near the center of the Dairy Queen/Little Chef parking lot entrance from Landry Street.
At trial, the Risemans argued that the survey was not accurate because the surveyor, Robert Wolfe, relied solely upon the Mistrics' title in formulating the boundaries. The Risemans also contended that the annual fee paid by their tenants to the Burleighs was intended solely to compensate the Burleighs for the two foot encroachment onto the Burleigh tract by Margaret Guidry's extension of the covered parking canopy in the early 1960s. It was the Risemans' position at trial that their tract extended to the eastern edge of the paved section of the parking lot. In the alternative, the Risemans urged that, even if the ideal boundary was correctly located by Goudeau, they had acquired ownership of the disputed area through more than 30 years possession exercised by their lessees.
The trial court fixed the boundary between the two tracts in accordance with the Goudeau survey. The trial judge rejected the Risemans' 30 year acquisitive prescriptive plea, reasoning that, since the Risemans' tenants were also tenants of the Burleighs, the Risemans' tenants could not possess the disputed area in favor of the Risemans and simultaneously adverse to their other lessors, the Burleighs. Judgment was rendered accordingly. Defendants appealed.
This appeal presents two issues for our review: first, whether the trial court erred in setting the ideal boundary according to the Goudeau survey; and, second, whether the trial court erred in rejecting appellants' plea of prescription under La.C.C. arts. 794 and 3486 et seq.

*229 THE IDEAL BOUNDARY
Insofar as a fixing of the ideal boundary is concerned, the parties rely on titles traced to a common author. La.C.C. art. 793 is applicable in this situation. It provides as follows:
When both parties rely on titles only, the boundary shall be fixed according to titles. When the parties trace their titles to a common author preference shall be given to the more ancient title.
See Williamson v. Kelly, 520 So.2d 868 (La.App. 3rd Cir.1987), writ denied, 522 So.2d 562 (La.1988), which discusses the trial court's duty to give preference to the more ancient title.
Defendants claim that, since theirs is the more ancient title, the trial court erred in fixing the boundary according to plaintiffs' survey which relied solely upon the plaintiffs' more recent title. Robert Wolfe, Jr., the surveyor, testified that he relied on the Mistrics' title and a City of Opelousas map in preparing the plat. The starting or reference point for the survey was the corner of Market and Landry Streets. He measured 81.5 feet westward along Landry Street from this starting point. This derived point was established as the southeast corner of the Mistric tract. He then proceeded to mark the 94 foot by 66 foot dimensions of their tract, which took in 32 feet of the Dairy Queen/Little Chef parking lot. Wolfe admittedly did not refer to the earlier Riseman title which provided for 104 feet, six inches eastward along Landry Street from the fence post east of Bayou Tesson. However, Wolfe measured the length of Landry Street westward across Bayou Tesson to the next intersection to verify the dimensions of the entire block, which measurement he found to be accurate.
Julian Kurtz, Edna Kurtz's son, testified that he personally measured approximately 104 feet eastward from the edge of the Bayou Tesson gully. To his surprise, that length was to the middle of the Diary Queen/Little Chef parking lot driveway, remarkably close to the southwest corner of the Mistric tract as fixed by Wolfe. He then measured 81.5 feet from Market Street westward and, again to his surprise, found this distance to be exactly where Wolfe had placed the southeast corner marker for the Mistric tract. Julian stated that he was "stunned" by these results. He further testified that the width and location of Bayou Tesson had greatly changed over the years and that the monument (fence post) referred to in the Riseman title could not be located. Finally, Kurtz testified that he began his measurements at the eastern edge of the present location of Bayou Tesson.
Edna Riseman Kurtz, a plaintiff, testified that she was always under the impression that the Riseman family owned the entire parking lot area. During the entire time of "presumed" ownership, the only indication she had of any encroachment onto the Burleigh/Mistric tract was the two foot metal canopy overhang. She stated that the Risemans never conducted a survey of their tract between Bayou Tesson and the Burleigh/Mistric tract.
Dr. Edward Burleigh, Jr. testified that it was his understanding that the annual fee paid the Burleighs by the Risemans' tenants was for parking. He did not elaborate further as to the land area covered by the rental payments.
In a boundary action, the boundary location is a question of fact to be determined by the trier of fact, and such determination should not be reversed on appeal in the absence of manifest error. Richard v. Thierry, 509 So.2d 604 (La.App. 3rd Cir.1987); Williams v. Peacock, 441 So.2d 57 (La.App. 3rd Cir.1983). From the testimony and evidence reviewed above, it is clear that Wolfe's method of surveying the Mistric tract was within the realm of acceptable surveying principles. Although Wolfe did not commence his survey with the earlier Riseman title, the record reflects a valid reason for his failure to do so, i.e., apparent destruction of the artificial monument referred to in the Riseman title and the change in location of Bayou Tesson. Wolfe started his survey from a known and clearly identifiable reference point, the corner of Market and Landry Streets. Hence, from a practical perspective, *230 it would have been virtually impossible to rely on the dimensions of the Risemans' more ancient title in conducting the survey of the Mistric tract. Additionally, the Risemans offered no expert evidence to contradict the location of the ideal boundary as fixed by Wolfe.
These factors, when combined with the fact that Wolfe's measurements were corroborated by the measurements of Julian Kurtz, defendants' own witness, prompts the conclusion that the trial court was not clearly wrong in relying on the only survey in evidence as accurately fixing the ideal boundary between the Mistric tract and the Riseman tract. Accordingly, this assignment of error lacks merit.

DEFENDANT'S ACQUISITIVE PRESCRIPTION CLAIM
Defendants argue, in the alternative, that even if the ideal boundary is located as established by the Goudeau survey, they have acquired title to the entire area of the paved parking lot by 30 year acquisitive prescription. In this regard, La.C.C. art. 794 provides:
When a party proves acquisitive prescription, the boundary shall be fixed according to limits established by prescription rather than titles. If a party and his ancestors in title possessed for thirty years without interruption, within visible bounds, more land than their title called for, the boundary shall be fixed along these bounds.
"Acquisitive prescription is a mode of acquiring ownership or other real rights by possession for a period of time". La. C.C. art. 3446. It is well settled that the party pleading acquisitive prescription bears the burden of proving all of the facts that are essential to support it. The proof required to fix a boundary according to acquisitive prescription is the same proof required to prove ownership in a petitory action based on 30 year acquisitive prescription, i.e., continuous, uninterrupted, peaceable, public, and unequivocal possession with a positive intention to possess as owner. La.C.C. arts. 3424, 3476 and 3486; Allen v. Martino, 529 So.2d 90 (La.App. 1st Cir.1988); Williams, supra; Briggs v. Pellerin, 428 So.2d 1087 (La.App. 1st Cir. 1983).
Defendants' acquisitive prescription claim rests entirely upon the possession exercised by their lessees. The following Civil Code articles are applicable.
La.C.C. art. 3428 states:
One may acquire possession of a thing through another who takes it for him and in his name. The person taking possession must intend to do so for another.
La.C.C. art. 3429 states:
Possession may be exercised by the possessor or by another who holds the thing for him and in his name. Thus, a lessor possesses through his lessee.
La.C.C. art. 3437 states:
The exercise of possession over a thing with the permission of or on behalf of the owner or possessor is precarious possession.
La.C.C. art. 3487 states:
For purposes of acquisitive prescription without title, possession extends only to that which has been actually possessed.
The owner acquires the benefit of another's corporeal possession of a thing only if it can be established that the possessor actually intended, at the moment he assumed possession of the thing, to hold such for the former and not for himself. McPherson v. Roy, 390 So.2d 543 (La.App. 3rd Cir.1980), writ denied, 396 So.2d 910 (La.1981). Since the above cited Civil Code articles clearly permit a lessee to possess property on behalf of his lessor, the initial corporeal possession may be exercised by the tenant on behalf of the alleged owner to whom he pays rent. Once possession through the lessee has begun corporeally it may, for purposes of acquisitive prescription, be preserved by external and public signs which evidence to the public the possessor's intent to maintain his possession. Seven Water Holes Corporation v. Spires, 393 So.2d 811 (La.App. 2d Cir.1981), writ denied, 399 So.2d 610 (La.1981).
Plaintiffs urge that, under the applicable principles of law set forth above, defendants' claim of acquisitive prescription *231 through their lessees was properly rejected by the trial court. They urge that the trial court was correct in its determination that, as lessees of both parties to this suit, the Risemans' tenants could not possess in favor of the Risemans adverse to the Burleighs.
Margaret Guidry, who leased the Riseman property from 1961 to 1970, testified that she had always assumed that her lease with the Risemans covered the area containing the businesses as well as the entire parking area. She stated that she began to pay rent to the Burleighs in 1961 after replacing the canvas canopy with the new metal canopy. It was her understanding that the rental payment was for the resulting two foot encroachment beyond the paved parking area overhanging the Burleigh property. She also stated that she was never made aware by either the Burleighs or the Risemans of the exact boundary location. The trial judge gave little weight to Ms. Guidry's testimony because he found that, according to the Burleigh records, rental payments for "parking space" began in 1955 while John Wilbert was leasing the property, not 1961 as claimed by Ms. Guidry.
Joe Riley testified that he is the owner and operator of the Dairy Queen. He began in the business by working for Wilbert in 1956 and eventually purchased both the Dairy Queen and Little Chef from Ms. Guidry in 1970. He has since sold the Little Chef but continued to operate the Dairy Queen. He stated that the parking lot has remained "as is" for the entire time that he has known of the businesses located on the Riseman property, i.e., since the early 1940s. After purchasing the businesses, he continued to pay the $75 annual rent to the Burleighs for what he considered was the two foot canopy overhang. After Mistric purchased the Burleigh tract, Mistric informed Riley that he owned part of the parking lot and wanted $200 per month for its use from Riley. According to Riley, he paid Mistric this amount for three months until he was informed by the Risemans that they owned the entire parking lot.
The only evidence in favor of the Mistrics on the issue of possession is the fact that the Riseman tenants paid an annual fee to the Burleighs. The Burleigh records confirm such payments were made. The trial court reasoned from this that the payments were intended for the parking area as surveyed by Wolfe. The trial court reasoned further that, as tenants of both parties, the successive owners of the Dairy Queen/Little Chef businesses, were precluded from possessing for the benefit of one of their lessors (Risemans) and, at the same time, adversely to the other lessor (Burleighs). We find this conclusion to be clearly wrong.
The record clearly establishes that the Risemans, through their tenants, exercised continuous, uninterrupted, peaceful, public, and unequivocal possession as owner of the property in dispute for a period in excess of 40 years. Their possession was within the visible bounds of the paved parking lot, which was constructed in the early 1940s and continuously maintained by the tenants since that time. The fact that the tenants possessed the disputed property on behalf of the Risemans is evidenced by written lease agreements which are made part of the record and by the testimony of the Risemans and their tenants. The possession by the Risemans' tenants inuring to the Risemans' benefit was continuous and uninterrupted until 1988 when the Mistrics first asserted a claim to a portion of the parking area and then instituted this boundary action. However, prior to this time, the Risemans had acquired title to the entire parking area by virtue of 30 year acquisitive prescription. The trial court's conclusion otherwise, that the Risemans' tenants' possession could not be considered adverse to the Mistrics' ancestors in title, is clearly wrong.
The record establishes only that, beginning in 1955, the Riseman tenants began paying a modest annual fee to the Burleighs. The Riseman tenants who testified, Margaret Guidry and Joe Riley, both stated that it was their understanding that this fee was being paid to the Burleighs because of the encroachment of the metal *232 canopy overhang which extended two feet beyond the eastern edge of the Riseman parking lot. Even Dr. Burleigh stated that, "... I think it was the awning which initiated some rental agreement which my father apparently made with either Guidry or Riley". The only other evidence concerning these payments were the self-serving aforementioned notations in the Burleighs' financial records. However, none of the plaintiffs' witnesses, including Dr. Burleigh, had any knowledge of what actual land area, if any, was intended to be covered by these payments.
The record is clear that whatever agreement existed between the Risemans' tenants and the Burleighs was held strictly between these parties. The Risemans never had any knowledge that their tenants were also paying an annual fee to the Burleighs. Although the Risemans through their tenants exercised open and notorious continuous possession of the parking lot area beginning in 1940, the Burleighs and their ancestors in title did not assert any claim to any part thereof for over 40 years except for the private agreement between the Burleighs and the Riseman tenants. Under these circumstances, whatever possession the Riseman tenants may be said to have exercised on behalf of the Burleighs was clandestine and equivocal and has no legal effect. La.C.C. arts. 3435 and 3436. Therefore, such possession cannot be considered adverse to the possession exercised by the lessees on behalf of the Risemans. Accordingly, we conclude and hold that the possession of the Risemans, through their tenants, of the entire parking lot area for in excess of 40 years was sufficient for the Risemans to acquire ownership of the disputed area by 30 year prescription. Accordingly, we conclude that the boundary between the properties of the parties should be fixed at the eastern edge of the parking lot. Since the exact location of the eastern edge of the parking lot is not monumented or shown on the Goudeau survey, we will remand this matter to the trial court with instructions to appoint a surveyor in accordance with the provisions of La.C.C.P. art. 3692 to establish, fix and monument the boundary between the properties of the parties in accordance with the views expressed herein. The costs of this survey is to be borne one-half (½) by plaintiffs and one-half (½) by defendants.

DECREE
For these reasons, the judgment of the trial court is reversed and set aside and there is judgment in favor of defendants and against plaintiffs fixing the boundary between the properties of the parties as the eastern edge of the parking lot constructed by the Risemans in the early 1940s. This matter is remanded to the trial court for appointment of a surveyor pursuant to La. C.C.P. art. 3692 who will locate and monument the boundary between the properties of the parties in accord with this judgment, with a plat of survey reflecting such location to be filed in the record of this matter. Costs of this survey are to be borne one-half (½) by plaintiffs and one-half (½) by defendants. Plaintiffs are taxed with all other costs of these proceedings both at the trial level and on appeal.
REVERSED, RENDERED AND REMANDED.