# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 10-1331

ANGELO SAGNIBENE, ET UX.

VERSUS

ROY O. MARTIN LUMBER CO., LLC

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT
PARISH OF ST. LANDRY, NO. 08-C-3766-D
HONORABLE DONALD W. HEBERT, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## MARC T. AMY
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Sylvia R. Cooks, Jimmie C. Peters, Marc T. Amy and Billy H. Ezell, Judges.

**AFFIRMED IN PART; REVERSED IN PART AND RENDERED.**

**THIBODEAUX, Chief Judge, dissents in part for the reasons assigned by Judge Cooks.**
**Cooks, J., concurs in part and dissents in part.**
**Ezell, J., concurs.**

> James P. Dore
> Robert E. Dille
> R. Benn Vincent, Jr.
> Lyn S. Savoie
> Kean, Miller, Hawthorne, D'Armond,
> McCowan & Jarman, L.L.P.
> Post Office Box 3513
> Baton Rouge, LA   70821
> (225) 387-0999
> COUNSEL FOR DEFENDANT/APPELLANT:
>       Roy O. Martin Lumber Company, LLC

**Craig L. Kaster**
**Post Office Box 815**
**Zachary, LA   70791-0815**
**(225) 658-5450**
**COUNSEL FOR PLAINTIFFS/APPELLEES:**
    **Angelo Sagnibene**
    **Nolia Dupuis Sagnibene**

**Paul D. Spillers**
**Theus, Grisham, Davis & Leigh, L.L.P.**
**Post Office Drawer 4768**
**Monroe, LA   71211-4768**
**(318) 388-0100**
**COUNSEL FOR AMICUS CURIAE:**
    **Louisiana Forestry Association**

AMY, Judge.

The plaintiffs sought damages after alleging that the defendant wrongfully cut timber on their property. The defendant reconvened, asserting that it was the rightful owner of the property. The trial court found in favor of the plaintiffs, determining that their title included the tract in dispute and that the defendant did not acquire the property by acquisitive prescription. The trial court awarded statutory damages for the fair market value of the timber cut and also awarded costs associated with the restoration of the property. The defendant appeals. For the following reasons, we affirm in part, reverse in part and render.

**Factual and Procedural Background**

This case involves the ownership of 3.96 acres of timberland in St. Landry Parish (hereinafter "the Subject Property") and, in turn, the appropriate damages due following the cutting of timber thereon without permission. The record demonstrates that the Subject Property is a rectangular strip located between a larger parcel owned by the plaintiffs, Angelo Sagnibene[1], and his wife, Nolia Dupuis Sagnibene, to the south and one owned by the defendant, Roy O. Martin Lumber Company, L.L.C., to the north. Both parties maintain that their respective property extends into the Subject Property.

The plaintiffs assert that the Subject Property was part of a larger parcel they acquired in 1977 through an Act of Exchange. This property was previously that of Mrs. Sagnibene's father, Cilton Dupuis, and his wife, Azelda LeJeune Dupuis. The Dupuis family had acquired their property in 1943 through an Act of Sale.

However, the defendant contends that it acquired the Subject Property through

---

[1] The record indicates that Mr. Sagnibene died during these proceedings. The court substituted Mrs. Sagnibene, as the independent administratrix of the Succession of Angelo Sagnibene, as the party plaintiff.

its own 1977 Act of Exchange. This Act of Exchange included a southern border of property previously possessed by Turner Lumber Company. The defendant asserts that, after the exchange, it maintained the old Turner Lumber Company boundary line by marking its border with a yellow painted line and that it marked the corners of its property by painting the initials "ROM" in these areas. Further, it contends it included this property in hunting leases and possessed this area through employee activity on the area.

The dispute as to the ownership of the Subject Property came to light in 1991, causing the Sagnibene family to conduct a survey at that time. The resulting plat identified the property as an "area of encroachment." Both parties assert that, after that time, they conducted their respective activities on the property. The defendant asserts it periodically painted its purported border with yellow paint.

The instant matter was provoked when, on December 17, 2007, the defendant began cutting timber from the Subject Property. Although the plaintiffs requested that the defendant's personnel cease operations, the cutting was completed the following day.

The plaintiffs subsequently filed this suit against the defendant, asserting that their property was damaged and seeking associated damages, attorney fees, and costs. In its answer to the petition, the defendant asserted its ownership of the Subject Property and its timber. Thereafter, in a reconventional demand, the defendant sought declaratory judgment that it was the owner of the Subject Property by ten-year and thirty-year acquisitive prescription.

Following a bench trial, the trial court determined that the plaintiffs were the owners of the Subject Property through their 1977 acquisition of the larger parcel.

2

It further denied the defendant's acquisitive prescription claim, finding that it failed to demonstrate adequate uninterrupted possession of the property. The trial court found that the plaintiffs were entitled to the treble damages available pursuant to La.R.S. 3:4278.1, and to $288,998 in restoration costs of the property.

The defendant appeals, assigning the following as error:

1. The lower court erred as a matter of law when it decided that Sagnibene's title included the four acres in dispute. The title described the northern boundary as the "Turner Lumber Company" line and the Turner Lumber Company line was clearly marked on the south line of the subject property.

2. The lower court erred in finding that Martin Lumber did not have corporeal possession when (1) Martin Lumber bought Turner Lumber Company's property in 1977, (2) at the time of acquisition, Turner Lumber Company maintained a white-painted boundary line along an existing hog-wire fence line, (3) Martin Lumber maintained the same boundary line as Turner Lumber Company, with a yellow-painted line along the hog-wire fence, and (4) Martin Lumber leased the property to a local hunting club and continued its timber operations on the property for the last 30-plus years.

3. The lower court erred in finding the clandestine hunting activity of Sagnibene's grandson and son-in-law was open, continuous, public, and within a visible boundary line.

4. The lower court erred as a matter of law when it declared that Martin Lumber failed to meet the good faith element for 10-year acquisitive prescription when (1) good faith possession is presumed and is determined at the beginning of possession, and (2) there was no evidence Martin Lumber did not have good faith at the beginning of possession.

5. The lower court erred in finding that Martin Lumber did not meet the requisite elements for 30-year acquisitive prescription, especially when Martin Lumber and its predecessor possessed the property within visible bounds.

6. The lower court erred as a matter of law when it awarded grossly excessive damages, totaling more than **30 times** the appraised value of the property.

3

**Discussion**

*Title*

The defendant first questions the trial court's determination that the plaintiffs owned the 3.96 acres of the Subject Property by virtue of their title. Primarily, it contends the trial court erred in finding that the northern boundary of the Subject Property was dictated by section line whereas the plaintiff's title description provides that their property was "bounded north by Section Line **or Turner Lumber Company.**" (Emphasis added.) The defendant contends the evidence indicates that the Turner Lumber Company property, which it acquired in 1977, was designated by a painted white line along the *southern border* of the Subject Property. As the defendant undoubtedly possesses the property to the north, it contends that the trial court erred in determining that its own property did not extend to the southern border of the Subject Property.

The plaintiffs' act of exchange by which they acquired their larger tract, and purportedly the Subject Property, provides as follows:

> Cilton Dupuis and wife, Mrs. Azelda LeJeune Dupuis do hereby convey, transfer and set over unto ANGELO SAGNIBENE and wife NOLIA DUPUIS SAGNIBENE, accepting for themselves, their heirs and assigns, the following described property, to-wit:

> A certain tract or parcel of naked land, without improvements, near Palmetto in the 4th Ward of St. Landry Parish, Louisiana, containing thirty-eight and 52/100 (38.52) acres and bounded, now or formerly, as follows: **North by Section line or Turner Lumber Company**; South by blacktopped highway leading to Palmetto and also partly by a one acre tract[2] of heretofore sold to Angelo Sagnibene et ux by Cilton Dupuis; East by lands of Preston Leger and also partly by aforesaid one acre tract of land belonging to Angelo Sagnibene and wife and West by

---

[2] By virtue of these two transfers the record refers to the plaintiffs as owning a 39.5 acre tract.

4

remaining and adjoining land of Cilton Dupuis.

> **The above parcel of land is situated in Section 4, T-4-S, R-6-E**, and is a part of a one hundred eleven (111) acre tract of land which Cilton Dupuis acquired of Harris Hyman, Jr. et al on July 20, 1943, and recorded July 23, 1943, as per act of sale duly recorded in the conveyances of St. Landry Parish, Louisiana.

(Emphasis added.)

In resolving the title issue, the trial court referenced the Sagnibene property description in the 1977 Act of Exchange, above, and further stated that:

> [The] Sagnibene[s]'s claim that the disputed 3.9 acres lies within the above listed property description granting them ownership by virtue of title executed in 1977 and traced to their common ancestor by virtue of title executed in 1943 between Cilton Dupuis and Harris Hyman, Jr. Furthermore, [the] Sagnibenes rely on a survey of the property conducted by Robert Wolfe, Jr. in 1991 and M.J. Goudeau in 1943.

> Roy O. Martin claims that the disputed property was part of the old Turner Lumber Company property, which was acquired by Friedberg/Moncrief in 1976. The property description that Roy O. Martin relies upon states in pertinent part:

>> A certain small tract or lot of land containing 3.71 acres more or less, located in the Southeast corner of the Southwest Quarter of Section 33, Township 3 South, Range 6 East, which is more particularly described as follows:

>> Beginning at a point on the South line of Section 33, Township 3 South, Range 6 East, forty nine feet west of the Southeast corner of South west Quarter of said Section 33, thence West along the Southern line of Section 33, a distance of seven hundred sixty-three feet, thence North a distance of two hundred nineteen feet to an iron stake, thence East a distance of seven hundred sixty-three feet to an iron stake forming the Northwest corner of Lot No. 1, thence South a distance of two hundred five feet to the point of beginning.[3]

---

[3] In its reply brief, the defendant disputes that the property description referenced by the trial court is the one upon which it relies. It instead asserts that the 1977 Friedberg/Moncrief Act of Exchange provides it with justiciable title. This latter description provides as follows:

5

After careful examination of the exhibits admitted into evidence, the court finds that the Sagnibenes have title to the 39 ½ acres which include the approximately four (4) acres being contested. The evidence presented establishes that in 1943 Mrs. Sagnibene's father purchased 111 acres from the Hymans. The purchased property bounded on the north by Section 33, Township 3 South, Range 6 East. In 1977, Mrs. Sagnibene and her husband obtained the 39 ½ acres from her father, including the approximately four (4) acres of this disputed area. In addition, testimony at trial verified that the disputed tract was referenced in numerous right of ways, servitudes, oil, gas and mineral leases, and tax records, all of which confirm the Sagnibenes own the approximately four (4) acres in dispute. The title records introduced by Roy O. Martin show Turner Lumber Company acquired property from St. Landry Timber Company in 1939 and that acquisition confirms the property acquired by Turner was the southwest quarter of Section 33, Township 3 South, Range 6 East. Later, Roy O. Martin acquired this property from Turner Lumber Company. However, this court finds that Roy O. Martin never acquired the property south of Section 33, which is where the subject four (4) acres are located.

Certainly, the trial court's reasons for ruling, by setting out the entirety of the plaintiffs' title description acknowledges the defendant's contention that the plaintiffs' property was bordered to the north by section line *or* Turner Lumber Company. The 1943 Act of Sale by which the plaintiffs' ancestor in title, Cilton Dupuis, acquired his 111 acre parcel from Harris Hyman, Jr. provided similarly.

As seen by the remainder of the trial court's reasons for ruling and in the defendant's assignment, the equivocation of the northern border by section line *or* Turner Lumber Company gives room for the defendant's claim by acquisitive prescription, discussed below. It does not, however, preclude the trial court's determination that the plaintiff held superior title to the Subject Property. According to the plaintiffs' expert in engineering and surveying, Robert Wolfe, Jr., the Subject

Section 33.
All of the West Half (W-1/2) of Section Thirty Three (33); South of the midpoint of Bayou Rouge, less and except 3.71 acres sold to Preston Leger by Act No. 340689, records of St. Landry Parish, Louisiana, and less and except 0.23 acres sold to Edgar Bertrand by Act No. 340688 of records of St. Landry Parish, Louisiana, both sales dated December 31, 1953.

6

Property is bordered to the North by the north line of Section 4. He determined that this section line was the same as determined in surveys completed in 1942 and 1943, as well in other surveys conducted in the area. This provided a reasonable basis for the trial court's determination that the Subject Property was bordered to the North by the section line between Sections 4 and 33, that the plaintiff's property description allowed for the designation of its northern border by section line, and that the defendant's property description included no indication that property was acquired south of Section 33. To the extent that the trial court's interpretation of the property description relied on factual determinations and credibility assessments of the parties' experts, these findings are supported by the record and are, therefore, not disturbed on appeal.

This assignment lacks merit.

*Acquisitive Prescription*

The defendant's next four assignments stem from the trial court's rejection of its alternative claims of ownership by ten-year or thirty-year acquisitive prescription. We address these in turn.

Possession

Louisiana Civil Code Article 3446 provides that "[a]cquisitive prescription is a mode of acquiring ownership or other real rights by possession for a period of time." However, important in the trial court's factual findings and now contested by the defendant, is Article 3476 which states that "[t]he possessor must have corporeal possession, or civil possession preceded by corporeal possession, to acquire a thing by prescription. *The possession must be continuous, uninterrupted, peaceable, public, and unequivocal.*" (Emphasis added.)

7

A party pleading acquisitive prescription must bear the burden of proving all essential facts. *Merritt v. Brennan*, 08-973 (La.App. 3 Cir. 2/4/09), 3 So.3d 646, *quoting, Mistrict v. Kurtz*, 610 So.2d 226, 230 (La.App. 3 Cir. 1992), *writ denied*, 612 So.2d 102 (La.1993). Further, the question of whether a party has possessed the subject property for prescription purposes is a factual determination for the trial court and will not be disturbed on appeal unless it is manifestly erroneous or clearly wrong. *Prince v. Palermo Land Co., Inc.*, 05-1399 (La.App. 3 Cir. 5/3/06), 929 So.2d 831. Also, the trial court is owed great deference and, when its findings are based upon determinations as to the credibility of witnesses, its findings are virtually never manifestly erroneous or clearly wrong. *Id.*

In ruling on the issue of possession, the trial court stated:

> With regard to possession, the Court finds that Roy O. Martin may have in fact painted trees in order to identify its boundary line between 1991 and 2007, walked the property, and inspected the property. However, the Sagnibenes have also exercised possession of this property during the same time and previous to the time Roy O. Martin attempted to possess. As testified, the Sagnibene family hunted the property every year from 1977 to present, set up deer stands on the property, and has also painted over the trees that had been marked. Roy O. Martin has failed to prove uninterrupted and continuous possession and failed to prove it conducted sufficient activities on the disputed property which gave notice to the public, including the Sagnibenes, that it intended to possess as owner. The possession claimed by Roy O. Martin was not actual, physical, open, public, unequivocal, continuous, uninterrupted and did not show an intent to possess as owner.

The defendant contends that the trial court erred in failing to accept what it considers to be evidence overwhelmingly demonstrating that it exercised corporeal possession of the Subject Property. In short, it asserts that its witnesses testified regarding a visible, painted boundary line, a fence, and the further possession of the property through the activities of a hunting club that leased a larger 1300 acre area from the

8

defendant. It also observes that the forested Subject Property distinctly differs from the Sagnibenes' adjacent farm land.

The defendant correctly points out that the record contains evidence that could have been construed as supporting a finding in its favor on the point of corporeal possession. However, the trial court could have interpreted the evidence as it did to conclude that the defendant failed to prove that its alleged possession fit within the definition of La.Civ.Code art. 3476. Both parties presented testimony and photographic evidence regarding whether the southern boundary of the Subject Property was identified by the yellow paint marks historically used by the defendant and whether white paint marks, historically used by Turner Lumber Company, existed in that area before the defendant acquired the property.

With regard to the early years of the defendant's possession, the defendant produced Jewel Willis, accepted as an expert in a number of timber-related areas, including timberland boundaries, who explained that he felt that the quality of the paint remnants and the wire associated with the fence remnants found on the border indicated that they predated the mid-70s. Further, Robert Bihm, the President of the Fritz Field Hunting Club, testified that this club has annually leased a 1300 acre tract from the defendant since 1978. He testified that he was familiar with the Subject Property and that yellow paint had been on the southern and eastern boundaries of the subject property since that time. He denied that he had seen other hunters in the area. He further explained that in the early 1980s, a hunter, Kenneth Dupuis, shot a deer from a stand adjacent to the property and that he had asked for permission to enter the Subject Property to retrieve the deer, which had crossed onto the property and died.

9

While pieces of evidence regarding this alleged early possession by the defendant and/or Turner Lumber Company is contained in the record, the trial court could have found that the quality of the evidence did not sufficiently satisfy the requirements of La.Civ.Code art. 3476. While Mr. Willis testified as to areas of paint and fencing that he felt existed in the 1970s, neither the testimony nor the photographic evidence mandated a finding that any border designation was "continuous, uninterrupted, peaceable, public, and unequivocal[.]" *Id.* Rather, the evidence as to this early existence of the paint and fencing was sporadic and vague. Instead, the trial court also heard from James Morgan, the plaintiffs' son-in-law, who testified that he had been going to the property for hunting purposes for forty-five years. He explained that he had not seen yellow paint "as such" on the trees along the southern border of the encroachment. Instead, he stated that he only saw yellow paint after it was covered with dark paint.[4] He noted that shortly before trial, the defendant again placed yellow paint over this dark paint. Also related to this early time period after the parties' acquisition of the property in the 1970s, Chandler Hutchins testified that he had hunted in the area for over thirty years and that he had never been told to leave.

Similarly, Mrs. Sagnibene testified that her parents purchased the property approximately sixty-five years earlier. She explained that some of her father's property was farmland, and some was woodland, which was used for hunting and for cattle during this time. After the wooded area was no longer used, she explained that the fencing on the area was no longer maintained. She denied knowing whether

---

[4] As further addressed below, Mrs. Sagnibene testified that, over ten years prior to trial, she placed brown paint on what she felt was her border after the defendant had freshly placed yellow paint on the border.

10

yellow paint had been on the border of the Subject Property when she and her husband purchased the property. These witnesses support a finding by the trial court that any marking of the southern border by either the defendant or Turner Lumber Company, in the early days of the time period at issue, was not so obvious and unequivocal as to necessarily fit within the parameters of Article 3476. Further, Mrs. Sagnibene's explanation of her family's long time use of the property, in part, as farmland and, as part, for hunting and raising cattle undercuts the defendant's contention that the change in landscape necessarily indicates that it was maintained as part of the adjacent timberland.

Also, the record indicates that, subsequent to 1991, the parties' boundary dispute became apparent when the defendant asked Mr. Sagnibene for permission to travel along a roadway on his farmland to cut timber from the Subject Property. While Mr. Sagnibene refused access, the parties met and Mr. Sagnibene hired Mr. Wolfe to complete the 1991 survey referenced above. Thereafter, and as referenced above, the defendant marked the southern border of the property with its yellow paint. It did so repeatedly. However, the trial court's determination that this possession was interrupted is supported by the record. Notably, Mrs. Sagnibene testified that she painted over the brown paint more than ten years prior to the trial. Too, when the timber cutting commenced in 2007, the defendant's employees were immediately notified that they were cutting on property claimed by the plaintiff.

Given the limited evidence regarding the quality and obviousness of the defendant's possession during the early years of the defendant's alleged possession and the very distinct interruptions remarked upon in 1991 and beyond, we find no manifest error in the trial court's factual findings regarding the defendant's

11

possession of the subject property. This finding is applicable to the defendant's claims of both ten-year and thirty-year acquisitive prescription.

Hunting

The defendant next argues in brief that the trial court erred in determining that "the clandestine hunting activity of Sagnibene's grandson and son-in-law was open, continuous, public, and within a visible boundary line." It points to a statement in the trial court's reasons for ruling that "the Sagnibenes presented evidence at trial to establish that they have corporeally possessed the subject property since acquisition." The defendant contends the trial court incorrectly found that there was evidence that the plaintiffs' hunting activities were public for purposes of acquisitive prescription.

However, reference to the trial court's reasons for ruling indicates that, after setting forth the defendant's evidence presented in support of its acquisitive prescription claim, the trial court's full statement, excerpted in part by the defendant, provides that: "Contrarily, the Sagnibenes presented evidence at trial to establish that they have corporeally possessed the subject property since acquisition." The remainder of the paragraph provided an overview of the plaintiffs' evidence, only a portion of which related to the plaintiffs' family's use of the area for hunting purposes. Instead, the trial court's later reference to the family's hunting practices was used as a finding undermining the defendant's contention that *it* proved its own sufficient possession of the property. Recall too, that the trial court found that the plaintiffs owned the property by virtue of their title. This assignment would be relevant had the trial court found that the plaintiffs owned the property by acquisitive prescription, which it did not.

12

Good Faith

As explained above, the defendant asserted that it possessed the property through either ten-year[5] or thirty-year acquisitive prescription. Louisiana Civil Code Article 3475 lists the requisites for acquisitive prescription of ten years as: "possession of ten years, good faith, just title, and a thing susceptible of acquisition by prescription." As noted by the defendant, Article 3481 creates a presumption of good faith and provides that "[n]either error of fact nor error of law defeats this presumption. This presumption is rebutted on proof that the possessor knows, or should know, that he is not owner of the thing he possesses." *Id.* Furthermore, "[i]t is sufficient that possession *has commenced* in good faith; subsequent bad faith does not prevent the accrual of prescription of ten years." La.Civ.Code art. 3482 (emphasis added). In this assignment, the defendant asserts that the trial court erred in determining that it did not have good faith in its possession of the property, at least at the commencement of the acquisitive prescription period.

However, this assignment is rendered moot by our above discussion regarding possession. As explained above, the evidence regarding the quality of the defendant's possession during the early years of its acquisition is limited. Instead, testimony only indicated remnants of historic paint and fencing. No testimony or physical evidence was so compelling as to the continuity or obviousness of these purported indicia of possession to have demanded a finding that the defendant established the first element required under Article 3475, i.e., *possession* of ten years.

This assignment is moot.

---

[5] La.Civ.Code art. 3473 provides that "[o]wnership and other real rights in immovables may be acquired by the prescription of ten years."

*Damages*

Alternatively, the defendant contests the trial court's award of damages. Chiefly, the defendant questions the trial court's award of restoration damages in the amount of $288,998, a figure the defendant asserts is 'more than 30 times" the appraised value of the 3.96 acres of the Subject Property. Instead, the defendant contends that jurisprudence indicates that the trial court's judgment should have been more reflective of the property's appraised value of $9,433 before the timber harvest.

In assessing damages, the trial court first awarded three times the value of the harvested timber. This award was in keeping with La.R.S. 3:4278.1, which provides a penalty for the cutting of trees without consent, as follows:

> A.    It shall be unlawful for any person to cut, fell, destroy, remove, or to divert for sale or use, any trees, or to authorize or direct his agent or employee to cut, fell, destroy, remove, or to divert for sale or use, any trees, growing or lying on the land of another, without the consent of, or in accordance with the direction of, the owner or legal possessor, or in accordance with specific terms of a legal contract or agreement.

> B.    Whoever willfully and intentionally violates the provisions of Subsection A shall be liable to the owner or legal possessor of the trees for civil damages in the amount of three times the fair market value of the trees cut, felled, destroyed, removed, or diverted, plus reasonable attorney's fees.

> C.    Whoever violates the provisions of Subsection A in good faith shall be liable to the owner or legal possessor of the trees for three times the fair market value of the trees cut, felled, destroyed, removed, or diverted, if circumstances prove that the violator should have been aware that his actions were without the consent or direction of the owner or legal possessor of the trees.

After citing Paragraphs A and B, above, the trial court provided the following findings:

> In *Thibodeaux v. Western World Insurance Company*, [391 So.2d 24 (La.App. 3 Cir. 1980)], the Third Circuit held that when a person intentionally trespasses onto the property of another with the intent to

14

cut timber, the plaintiff's [sic] should be awarded three times the fair market value of the trees pursuant to statute, plus the cost associated with restoration of the property.

Based on the evidence, testimony, and record, this Court finds that Roy O. Martin was in bad faith and willfully trespassed onto the Sagnibene[s]'s property, removing standing timber belonging to the same. In addition to cutting standing timber not belonging to it, Roy O. Martin left the property in an unacceptable condition, causing the property to be of no use for harvesting timber or any other purpose. The Court finds that the Sagnibenes's [sic] are entitled to three times the value of the trees and the restorative amount required to return the property to an acceptable condition.

In determining the amount of damages recoverable, Plaintiff's [sic] presented testimony and evidence as follows:

- Mr. Culpepper's services were employed to determine the value of the timber removed from the property. Mr. Culpepper testified that approximately 104 trees valued at $13,459 [6], were removed from the property.

- Mr. Johnson testified that the cost of removing stumps and returning the property to natural grade so trees could be replanted were estimated to total $288,998.

The court finds the testimony presented by the plaintiff regarding damages is credible and reliable, [and] therefore relies on such evidence presented in determining the total amount of recoverable damages.

Thus, based on the evidence cited, the resulting judgment awarded damages to the plaintiff in the amount of $329,075.00[7], attorney fees in the amount of $13,225.41, and associated expert witness fees.

Here, the trial court awarded treble damages under La.R.S. 3:4278.1 and those attributable to restoration.[8] It cited *Thibodeaux*, 391 So.2d 24, for the proposition that

---

[6] Mr. Culpepper's report indicates that the actual figure is $13,359. This correct figure is reflected in the total amount awarded in the judgment.

[7] The reasons indicate that this figure "includes three times the market value of the trees totaling $40,077 and restoration costs of $288,998."

[8] Although the plaintiff sought restoration damages for the removal of stumps and the return of the grade after the timber harvesting, the trial court did not award damages associated with the planting of trees.

both were available. However, *Thibodeaux* predates relevant Louisiana Supreme Court jurisprudence on the issue of restoration after property damage caused by tortious conduct.

In *Hornsby v. Bayou Jack Logging*, 04-1297 (La. 5/6/05), 902 So.2d 361, 365, the Louisiana Supreme Court addressed the "proper measure of damages due a landowner whose timber was removed without consent." In laying out the available remedies, it advised that it had previously held that such a landowner "may recover pursuant to La.R.S. 3:4278.1 *or* under general tort principles set forth in La.Civ.Code art. 2315[9]." *Id.* (emphasis added), citing *First South Prod. Credit Ass'n v. Georgia-Pacific*, 585 So.2d 545 (La.1991). Thus, it is clear that in the present matter the judgment was in error insofar as it awarded damages pursuant to La.R.S. 3:4278.1 *and* for restoration damages pursuant to La.Civ.Code Code art. 2315. We turn to consideration of the evidence to determine which theory of recovery is appropriate.

The supreme court noted that the calculation of statutory damages pursuant to La.R.S. 3:4278.1 is clear and unambiguous. *Hornsby*, 902 So.2d 361. Yet, general tort recovery "when restoration is the objective, is not as straightforward." *Id.* at 365. For this latter analysis, the supreme court referred to its existing analysis of the recovery of property restoration costs allegedly due under La.Civ.Code art. 2315. *Id.*, citing *Roman Catholic Church of the Archdiocese of New Orleans v. Louisiana Gas Serv. Co.*, 618 So.2d 874 (La.1993).

In *Roman Catholic*, 618 So.2d at 879, the supreme court concluded that:

> [A]s a general rule of thumb, when a person sustains property damage due to the fault of another, he is entitled to recover damages including the cost of restoration that has been or may be reasonably incurred, *or*,

---

9 Louisiana Civil Code Article 2315(A) provides that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it."

at his election, the difference between the value of the property before and after the harm.

(Emphasis added.)  Notably, the court further remarked that:

If, however, the cost of restoring the property in its original condition is disproportionate to the value of the property or economically wasteful, unless there is a reason personal to the owner for restoring the original condition or there is a reason to believe that the plaintiff will, in fact, make the repairs, damages are measured only by the difference between the value of the property before and after the harm.

*Id.* at 879-80.

In this case, the cost of restoring the property to its original condition is undoubtedly disproportionate to the value of the property.  The plaintiff put on no evidence of the property's value before the cutting of the timber, although their expert arborist and forester estimated that the timber cut from the Subject Property had a value of $13,359.  However, the defendant's expert testified that, even assuming the inclusion of timber on the property, the land had a value of $2,382 per acre or a total value of $9,433.  Thus, and even assuming that the plaintiffs would have valued the land at a higher figure as their estimates of the timber value exceeded those of the defendants' expert[10], the restoration of the grade awarded by the trial court in the amount of $288,998 was disproportionate to the value of the land even before the removal of the timber.  Further, we note that the defendant presented testimony indicating that, if the land was left alone, without restoration work, merchantable trees would once again grow within fifteen years.

Returning to the *Roman Catholic*, 618 So.2d at 879-80 analysis, we note that the supreme court provided that disproportionate awards were not available "unless there is a reason personal to the owner for restoring the original condition or there is

[10] The defendant's expert valued the timber removed at $8,640 whereas the plaintiff assumed the value of the timber as $13,359.

17

a reason to believe that the plaintiff will, in fact, make the repairs[.]" In this case, there is no such evidence requiring the disproportionate award. In light of the fact that the plaintiffs have been recompensed for the timber on the property, they have presented no evidence that the return of the property by way of considerable removal of stumps and earthwork is necessary for reasons personal to the plaintiffs. Instead, Mrs. Sagnibene only testified regarding her family's historic use of this property for hunting. However, the relevant testimony did not indicate that their hunting activities were limited to the Subject Property nor was the testimony of the family members conclusive as to the extent that it could no longer be used for this purpose.

Finally, in *Hornsby*, 902 So.2d at 367, the supreme court observed that for a party attempting to prevail under the restoration remedy, the primary objective may be "to restore the property as nearly as possible to the original state," but that this restoration may not be possible at times and may not be cost effective. Such was the case in *Hornsby*, as the supreme court determined that, under the *Roman Catholic* analysis, the plaintiff failed to present sufficient evidence of reasons personal to the owner to justify the restoration damages.

However, the supreme court in *Hornsby* found sufficient evidence for the alternate award of treble damages under La.R.S. 3:4278.1. The same situation is present in this case. As we have explained, the plaintiffs' evidence does not support a general tort award pursuant to the *Roman Catholic* analysis. However, the evidence warrants the award of treble damages and attorney fees under La.R.S. 3:4278.1(B). In short, the record supports the trial court's determination that the defendant cut and removed the trees of another without consent and did so after being informed, on the first day of cutting, that the plaintiffs asserted ownership of the property.

Furthermore, we note that, if the plaintiffs were allowed to recover under both this tort theory and the available statutory recovery, this "would result in duplication of damages." *Hornsby*, 902 So.2d at 372 (Weimer, J., concurring).

Accordingly, we affirm the trial court's award of statutory damages in the amount of $40,077. We further affirm the award of attorney fees made under the statute. However, we reverse that portion of the judgment awarding $288,988 in damages for the restoration of the property.

## DECREE

For the foregoing reasons, the judgment of the trial court is affirmed insofar as it was entered in favor of Nolia Dupuis Sagnibene, both in her individual capacity and as the independent administratrix of the succession of Angelo Sagnibene. However, the judgment is vacated insofar as it awarded restoration damages in the amount of $288,988. Judgment is recast, in part, as follows:

> Judgment is granted herein in favor of Nolia Dupuis Sagnibene, in her individual capacity and as the independent administratrix of the succession of Angelo Sagnibene, and against Roy O. Martin Lumber Company, L.L.C. in the sum of $40,077 together with legal interest from date of judicial demand until paid.

That portion of the judgment awarding attorney fees and court costs is affirmed. All costs of this proceeding are assessed equally between the appellees and the appellant.

**AFFIRMED IN PART; REVERSED IN PART AND RENDERED.**

ANGELO SAGNIBENE, ET UX.

VERSUS

ROY O. MARTIN LUMBER CO., LLC

**COOKS, J. CONCURS IN PART AND DISSENTS IN PART**

The majority finds no manifest error in the trial court's finding that Plaintiffs enjoy good title to the property and that defendant has not acquired title by any means including thirty year acquisitive prescription. I fully agree with this portion of the majority's opinion. The majority also finds that Plaintiffs are only entitled to treble damages based on the fair market value of the timber cut and removed from their property along with attorney fees and that they are not entitled to the trial court's award for cost of restoration. While I agree that Plaintiffs are entitled to treble damages and attorney fees for Defendant's bad faith removal of their timber, I do not agree with the majority's decision limiting Plaintiffs' recovery to these statutory damages and I must, therefore, dissent in part.

Plaintiffs' property has been left in an unusable condition covered with tall stumps which remain after the bad faith, wrongful removal of trees by Defendant. Plaintiffs' have suffered far more in damages than the mere fair market value of the timber unlawfully removed. I do not believe the legislature intended to limit Plaintiffs' recovery for damages to only recovery for the timber unlawfully removed. Louisiana Revised Statutes 3:4281.1 provides a remedy for the valuation of the trees as timber removed unlawfully and assesses a punitive penalty for Defendant's intentionally tortious action which includes the recovery of attorney fees and expert

1

fees. Nothing in the language of the statute limits or bars Plaintiffs' recovery for damages other than the loss of the trees which Plaintiffs' may incur as a result of Defendant's trespass upon Plaintiffs' property. As Justice Weimer wrote in his concurrence in *Hornsby v. Bayou Jack Logging*, 04-1297 (La. 5/6/05), 902 So.2d 361, 372 (La. 2005):

> Pursuit of treble damages for the fair market value of the timber pursuant to LSA– R.S. 3:4278.1 did not preclude plaintiffs from the right to pursue damages such as mental anguish or damage to the property itself (i.e. damage to ditches, drainage, fences) which they may have sustained because of the unauthorized cutting of the trees.

In *Otwell v. Diversified Timber Services, Inc.*, 04-924 (La.App. 3 Cir. 1/26/05), 896 So. 2d 222, *writ denied* 05-467 (La. 4/22/05), 899 So.2d 575, our court awarded general damages for loss of use to plaintiffs in that timber trespass suit in addition to statutory treble damages and attorney fees. One of the plaintiffs in *Otwell* merely enjoyed a usufruct over the property but our court found he was entitled to general damages of $4200.00 for **his loss of use of the property**. Mrs. Sanders was also awarded general damages in the amount of $1800.00 for **her loss of use of the property.**

In *Roman Catholic Church of Archdiocese of New Orleans v. Louisiana Gas Serv. Co.*, 618 So.2d 874, 876 (La. 1993) (emphasis added) (citations omitted), the Louisiana Supreme Court set forth the fundamental legal precepts in Louisiana regarding full indemnification for damages sustained as a result of the fault of another and the Constitutionally protected "Right to Property":

> Every act of man that causes damage to another obliges him by whose fault it happened to repair it. La.Civ.Code art. 2315. One injured through the fault of another is entitled to full indemnification for damages caused thereby. In such a case, '[t]he obligation of defendant... is to indemnify plaintiff–to put him in the position that he would have occupied if the injury complained of had not been inflicted on him.'

> Consequently, "[w]hen property is damaged through the legal

2

fault of another, the primary objective is to restore the property as nearly as possible to the state it was in immediately preceding the damage..."

[ ]
These basic precepts have been reaffirmed and strengthened indirectly by the Declaration of the Right to Property of our state constitution. Article I, Section 4 of the Louisiana Constitution of 1974, in pertinent part, provides:

"**Every person has the right to acquire, own, control, use, enjoy, protect, and dispose of private property**.... Property shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation paid to the owner or into court for his benefit..."

Thus our constitution does not simply require that the owner of condemned or damaged property be compensated with the market value of the property taken and severance damage to his remainder, but that he be "compensated to the full extent of his loss' and 'placed in as good a position pecuniarily as [he] enjoyed prior to the taking." Accordingly, **justice, reason, and the principle of full reparation** of Louisiana Civil Code article 2315 require that where an individual's property **is damaged unlawfully by a tortfeasor for no good reason**, he be compensated at least as fully as when his property is damaged by the state for a public purpose pursuant to the owner's obligation of citizenship to the community.

I do not believe the legislature intended to abrogate these fundamental precepts of property rights in enacting La.R.S. 3:4281.1. It should not be applied so as to limit plaintiffs' full recovery for all of their losses to the treble damages plus attorney fees calculated on the fair market value of the trees as timber wrongfully cut. The statute is clearly punitive in nature and sets forth punitive damages for a defendant's bad faith behavior **for the loss of the timber**. *Hornsby*, 902 So.2d at 369. Nowhere does the statute limit or deny plaintiffs recovery of any other general damages to which they may be entitled, recovery for which is the only means to make these Plaintiffs whole.

Additionally, if Defendant faces only the payment of the fair market value of the timber cut, plus treble damages and attorney fees, this case demonstrates that the amount of such damages does little to discourage the intentional, bad faith, tortious

3

destruction of a plaintiff's property by a willful defendant. The Defendant in this case was told to stop cutting the trees but willfully proceeded to cut the timber and leave Plaintiffs' property in a deplorable condition. I believe the majority's decision sends the wrong message to the people of this state, i.e. that plaintiffs faced with a similar scenario can only protect their property from eminent destruction/desecration by threat of force against the illegal trespasser rather than rely on our courts to resolve such disputes. When Defendant was told not to cut the trees because they were on Plaintiffs' property, Defendant could and should have proceeded to court if they truly believed they were the rightful owner of the disputed property. Instead, they proceeded to decimate Plaintiff's property and get what they wanted to get for their use. Defendants willfully deprived Plaintiffs of their constitutional right to **"own, control, use, enjoy, protect, and dispose of"** their property and the limited award proposed by the majority falls far short of full compensation for these Plaintiffs' loss and is an insufficient deterrent to stop such behavior in the future. Plaintiff is an elderly lady who in all probability cannot live long enough to allow nature to return her property to the state in which she was enjoying it before Defendant's willful trespass. This simply cannot be what the legislature intended. Such intent runs afoul of our citizens' constitutional property rights and our fundamental precepts of full compensation for a loss occasioned by the fault of another.

Because the trial court awarded what it called restoration damages it did not make an award for any other general damages. I believe this case should be remanded in part to the trial court for a determination of an amount of general damages for loss of use and for any other general damages to which Plaintiffs may be entitled, including removal of the stumps. I respectfully dissent from that portion

4

of the decision which limits Plaintiffs' recovery and leaves Plaintiffs without full compensation for their loss.